# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2910

_____

Office of the Prosecuting Attorney, for St. Louis County

*Movant*

Norman Brown; Ralph McElroy; Sidney C. Roberts; Theron Roland, also known as Theron "Pete" Roland

*Plaintiffs - Appellees*

v.

Anne L. Precythe, in her official capacity, Director of Missouri Department of Corrections; Kenneth Jones, in his official capacity, Chairman of the Missouri Board of Probation and Parole; Jim Wells, in his official capacity, Member of the Missouri Board of Probation and Parole; Martin Rucker, in his official capacity, Member of the Missouri Board of Probation and Parole; Ellis McSwain, Jr., in his official capacity, Member of the Missouri Board of Probation and Parole; Don Ruzicka, in his official capacity, Member of the Missouri Board of Probation and Parole; Jennifer Zamkus, in her official capacity, Member of the Missouri Board of Probation and Parole; Gary Dusenberg, in his official capacity, Member of the Missouri Board of Probation and Parole

*Defendants - Appellants*

------------------------------

Current and Former State Prosecutors, State Attorneys General, DOJ Officials, U.S. Attorneys, and Former Corrections Directors; NAACP Legal Defense and Educational Fund, Inc.; Juvenile Law Center; Children and Family Justice Center; Fred T. Korematsu Center for Law and Equality; American Academy of Child and

Adolescent Psychiatry; Individual Mental Health Professionals; The Campaign for the Fair Sentencing of Youth; National Association for Public Defense

*Amici on Behalf of Appellee(s)*

_____

No. 19-3019

_____

Office of the Prosecuting Attorney, for St. Louis County

*Movant*

Norman Brown; Ralph McElroy; Sidney C. Roberts; Theron Roland, also known as Theron "Pete" Roland

*Plaintiffs - Appellants*

v.

Anne L. Precythe, in her official capacity, Director of Missouri Department of Corrections; Kenneth Jones, in his official capacity, Chairman of the Missouri Board of Probation and Parole; Jim Wells, in his official capacity, Member of the Missouri Board of Probation and Parole; Martin Rucker, in his official capacity, Member of the Missouri Board of Probation and Parole; Ellis McSwain, Jr., in his official capacity, Member of the Missouri Board of Probation and Parole; Don Ruzicka, in his official capacity, Member of the Missouri Board of Probation and Parole; Jennifer Zamkus, in her official capacity, Member of the Missouri Board of Probation and Parole; Gary Dusenberg, in his official capacity, Member of the Missouri Board of Probation and Parole

*Defendants - Appellees*

-------------------------------

Children and Family Justice Center; Current and Former State Prosecutors, State Attorneys General, DOJ Officials, U.S. Attorneys, and Former Corrections

Directors; Fred T. Korematsu Center for Law and Equality; Juvenile Law Center; The Campaign for the Fair Sentencing of Youth

*Amici on Behalf of Appellant(s)*
_____

Appeals from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: November 23, 2020
Filed: September 17, 2021
_____

Before COLLOTON, ARNOLD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

This appeal arises from a constitutional challenge to Missouri's remedial parole review process for individuals sentenced to mandatory life without the possibility of parole for homicide offenses committed as juveniles. The plaintiffs, a class of Missouri inmates who were sentenced to mandatory life without parole for such juvenile homicide offenses (collectively, Plaintiffs or the JLWOP Class), claim that Missouri's parole review policies and practices violate their rights to be free from cruel and unusual punishment and their rights to due process of law under the U.S. Constitution and the Missouri Constitution. The district court granted summary judgment in favor of Plaintiffs, holding that Missouri's parole review process did not provide a meaningful opportunity for release based on Plaintiffs' demonstrated maturity and rehabilitation. After ordering Missouri to present a plan to remedy those constitutional violations, the district court also ordered that Missouri (1) could not use any risk assessment tool in its parole review process unless the tool was developed specifically to address members of the JLWOP Class, and (2) was not required to

provide state-funded counsel to JLWOP Class members in their parole proceedings. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, vacate in part, and remand to the district court for further proceedings.

I.

The named Plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland are Missouri inmates currently serving sentences for homicide offenses committed as juveniles (i.e., when they were less than 18 years old). Each received a mandatory sentence of life without parole.

In 2012, after the Plaintiffs were sentenced, the Supreme Court held that mandatory sentences of life without parole for juvenile homicide offenders violate the Eighth Amendment. See Miller v. Alabama, 567 U.S. 460, 479 (2012). Four years later, the Court held that Miller applies retroactively in cases on collateral review. See Montgomery v. Louisiana, 577 U.S. 190, 206 (2016). In response, Missouri enacted Senate Bill 590 (SB 590), Act of July 13, 2016, SB 590, 2016 Mo. Laws 688 (codified as amended at Mo. Rev. Stat. §§ 558.047, 565.020 *et seq.* (2016)), which permits "[a]ny person sentenced to a term of imprisonment for life without eligibility for parole before August 28, 2016, who was under eighteen years of age at the time of the commission of the offense or offenses," to petition for parole after serving 25 years of their sentence. Mo. Rev. Stat. § 558.047.1(1). Upon receiving a petition, the Missouri Board of Probation and Parole (the Board) must hold a hearing to determine whether the petitioner shall be granted parole. Id. § 558.047.4. In making its decision, the Board must consider 15 factors, including "[e]fforts made toward rehabilitation since the offense or offenses occurred," "[t]he subsequent growth and increased maturity of the person since the offense or offenses occurred," and "[t]he degree of the [person's] culpability in light of his or her age and role in the offense." See id. §§ 558.047.5, 565.033.2.[1]

---

[1]See infra Appendix A.

Each of the named Plaintiffs petitioned for parole under SB 590 but was denied after a hearing before the Board. On behalf of a class of similarly situated Missouri inmates, they sued the Director of the Missouri Department of Corrections and members of the Board (collectively, Defendants or Missouri) in their official capacities under 42 U.S.C. § 1983. Seeking declaratory and injunctive relief, they claimed that the policies and practices adopted by the Board violate their constitutional rights.[2] Among other things, Plaintiffs claimed that they are prohibited from viewing their parole files, preventing them from adequately preparing for their

_____

[2]The dissent contends that Plaintiffs' claims are not properly brought under 42 U.S.C. § 1983. In the dissent's view, Plaintiffs' "lead argument" on appeal is that their original sentences of mandatory life without parole are invalid and, as a result, they must pursue their claims by way of a writ of habeas corpus under 28 U.S.C. § 2254. Respectfully, we disagree. First, it is undisputed that, under Miller, Plaintiffs' initial mandatory life without parole sentences were unconstitutional. See Appellants' Br. at 33 (acknowledging the "constitutional defect" in Plaintiffs' original sentences of mandatory life without parole). Second, while we do agree that a prisoner in state custody may not use a § 1983 action to challenge "the fact or duration of his confinement," Preiser v. Rodriguez, 411 U.S. 475, 489 (1973), that is not this case. Plaintiffs have already been resentenced to life with the possibility of parole after 25 years, and they do not challenge that sentence. Rather, Plaintiffs challenge the constitutionality of "parole eligibility" and "parole suitability" procedures, and these challenges may proceed under § 1983 where the prisoner does not seek "immediate release from prison" or the "shortening" of his term of confinement. Wilkinson v. Dotson, 544 U.S. 74, 79-80 (2005). More specifically, Plaintiffs seek a declaratory judgment that Missouri's parole procedures violate their constitutional rights and injunctive relief requiring Missouri to formulate and implement policies that vindicate those rights by affording them a meaningful *opportunity* for release. Dist. Ct. Dkt. 65 at 38-39. Plaintiffs do not seek relief that would necessarily result in their immediate release from prison or the shortening of their sentences, nor does the success of their claims turn on the validity of their individual sentences. Under these circumstances, Plaintiffs' claims are properly brought under § 1983. Wilkinson, 544 U.S. at 81 ("§ 1983 remains available for procedural challenges where success in the action *would not necessarily* spell immediate or speedier release for the prisoner").

-5-

parole review hearings; that only one "delegate" may appear on their behalf at the hearings, and that delegate is limited to speaking about their plans to transition into the community upon release; that victims, their supporters, and the prosecuting attorney, in contrast, may attend the hearings in any number and may speak for any length of time on any subject (while the Plaintiffs are sequestered outside of the hearing upon request); and that the Board's denial of parole is communicated on a "barebones, boilerplate form" that does not provide detail about the Board's reasoning. Altogether, Plaintiffs argued, these practices deprived them of their constitutional right to a meaningful and realistic opportunity to obtain release based upon demonstrated maturity and rehabilitation.

After limited discovery, the parties cross-moved for summary judgment. On October 12, 2018, the district court granted summary judgment in favor of the JLWOP Class, finding that the policies and procedures of the SB 590 parole review process violated Plaintiffs' constitutional rights. In light of the Supreme Court's admonition that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance," Graham v. Florida, 560 U.S. 48, 75 (2010), the district court denied Plaintiffs' request for injunctive relief and instead ordered Missouri to propose a workable remedy—"a plan for compliance with applicable statutory and constitutional requirements." After sending the parties to mediation and conducting an evidentiary hearing to work out the details of an adequate remedy, the district court ordered Missouri to implement a 23-part plan. Only two parts of that plan are relevant to this case. First, over Missouri's objection, the court ordered that Missouri was prohibited from using the Ohio Risk Assessment System (ORAS) or similar risk assessment tool[3] unless it was "developed to address inmates affected by Montgomery

---

[3]According to the affidavit of Dr. Todd Clear, one of Plaintiffs' witnesses, "[a] risk assessment tool measures a prisoner's crimonogenic risk factors and specific needs, generating a score that places the individual into a specific risk category (typically, 'low,' 'moderate,' or 'high')." That score is used to "measure[] the likelihood that an individual may engage in some behavior of note, such as a crime."

or <u>Miller</u>." Second, over Plaintiffs' objection, the court ordered that Missouri was not required to provide state-funded counsel to the JLWOP Class members in their parole proceedings. This appeal and cross-appeal followed.

## II.

First, Missouri appeals the district court's summary judgment ruling, arguing that the parole review process under SB 590 did not violate Plaintiffs' constitutional rights. We review the district court's grant of summary judgment de novo. <u>See</u> <u>McKay v. City of St. Louis</u>, 960 F.3d 1094, 1099 (8th Cir. 2020). In doing so, we view the facts in the light most favorable to the nonmoving party, giving it the benefit of all reasonable inferences. <u>See</u> <u>Oglesby v. Lesan</u>, 929 F.3d 526, 531–32 (8th Cir. 2019). "A motion for summary judgment is properly granted when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>McKay</u>, 960 F.3d at 1099 (quoting Fed. R. Civ. P. 56(a)).

## A.

Plaintiffs claim that the Board's policies and practices deprive them of their rights guaranteed by the Eighth and Fourteenth Amendments.[4] To prevail on their

<u>See also</u> Dawinder S. Sidhu, <u>Moneyball Sentencing</u>, 56 B.C. L. Rev. 671, 673 (2015) (explaining that a risk assessment tool "take[s] information on recidivism rates for groups and use[s] them to estimate the risk of recidivism for individuals possessing those same group characteristics").

[4]Plaintiffs also claim that the Board's policies and practices violate their rights guaranteed under the Missouri Constitution. <u>See</u> Mo. Const. art. I, § 21 (declaring that "cruel and unusual punishment [shall not be] inflicted"); <u>id.</u> art. I, § 10 (declaring that "no person shall be deprived of life, liberty or property without due process of law"). Because Missouri interprets these state constitutional provisions in parallel

§ 1983 claims, Plaintiffs must establish "(1) that the [Defendants] acted under color of state law, and (2) that the alleged wrongful conduct deprived [them] of a constitutionally protected federal right." Green v. Byrd, 972 F.3d 997, 1000 (8th Cir. 2020) (quoting Schmidt v. City of Bella Villa, 557 F.3d 464, 471 (8th Cir. 2009)). As the district court found, it is undisputed that the Defendants at all relevant times acted under color of state law, so we need only resolve the second question.

The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, see Furman v. Georgia, 408 U.S. 238, 239 (1972) (per curiam), provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishment inflicted*." U.S. Const. amend. VIII (emphasis added). The right to be free from excessive sanctions "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" Roper v. Simmons, 543 U.S. 551, 560 (2005) (quoting Atkins v. Virginia, 536 U.S. 304, 311 (2002)). Over the past two decades, the Supreme Court has recognized that imposing certain punishments on juvenile offenders violates that well-established principle. See id. at 568; Graham, 560 U.S. at 74; Miller, 567 U.S. at 479.

In Roper, the Court held that the Eighth Amendment prohibits sentencing juvenile offenders to death. See 543 U.S. at 568 ("Capital punishment must be limited to those offenders . . . whose extreme culpability makes them 'the most deserving of execution.'" (quoting Atkins, 536 U.S. at 319)). In reaching that conclusion, the Court noted three characteristics of juvenile offenders that prevent

---

with their federal counterparts, we do not separately analyze Plaintiffs' claims under the Missouri Constitution. See, e.g., Burnett v. State, 311 S.W.3d 810, 814 n.3 (Mo. Ct. App. 2009) (noting the Missouri Constitution "provides the same protection against cruel and unusual punishment" as the Eighth Amendment of the U.S. Constitution); Jamison v. Mo. Dep't of Soc. Servs., Div. of Fam. Servs., 218 S.W.3d 399, 405 n.7 (Mo. banc 2007) (noting that "Missouri's due process provision parallels its federal counterpart").

them from reliably "be[ing] classified among the worst offenders" for whom the death penalty is a proportional punishment. Id. at 569. "First, as any parent knows and as scientific and sociological studies . . . confirm," juveniles more often and more predictably than adults exhibit "[a] lack of maturity and an underdeveloped sense of responsibility" that "often result[s] in impetuous and ill-considered actions and decisions." Id. (quoting Johnson v. Texas, 509 U.S. 350, 367 (1993)). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures," which is in part explained "by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment." Id. Third, juveniles' characters are "not as well formed" as those of adults, and their personality traits "are more transitory, less fixed." Id. at 570. Considered together, these characteristics instruct that "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult,'" id. (quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality opinion)), and that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." Id.

Several years after its decision in Roper, the Supreme Court held that the Eighth Amendment bars sentencing a juvenile offender to life without parole for a nonhomicide offense. Graham, 560 U.S. at 74. The Court echoed Roper's observations about juveniles, see id. at 68 ("A juvenile is not absolved of responsibility for his actions, but his transgression is not as morally reprehensible as that of an adult." (internal quotation omitted)), and emphasized the particular severity of a life without parole sentence, which "deprives the convict of the most basic liberties without giving hope of restoration," id. at 69–70. In the Court's view, sentencing a juvenile offender to life without parole assumes that person "forever will be a danger to society," which itself "requires the sentencer to make a judgment that the juvenile is incorrigible." Id. at 72. But such assumptions are constitutionally suspect because "incorrigibility is inconsistent with youth." Id. at 73 (internal

quotation omitted).  Because juvenile nonhomicide offenders "should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential," id. at 79, the Eighth Amendment guarantees they are afforded "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  Id. at 75.

The Supreme Court extended that logic two years later by holding that the Eighth Amendment bars mandatory sentences of life without parole for juvenile homicide offenders.  Miller, 567 U.S. at 479.  Taking up Graham and Roper's "foundational principle" that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children," id. at 474, the Court held that such mandatory life without parole sentences are unconstitutional because they "mak[e] youth (and all that accompanies it) irrelevant."  Id. at 479.  To comport with the Eighth Amendment, sentencing schemes must distinguish "between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'"  Id. at 479–80 (quoting Roper, 543 U.S. at 573); see also Jones v. Mississippi, 141 S. Ct. 1307, 1317–18 (2021) ("A hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." (quoting Montgomery, 577 U.S. at 210)).  Under this rule, the Court opined that juvenile homicide offenders serving life without parole sentences "will be uncommon."  Miller, 567 U.S. at 479.

Four years later, the Supreme Court gave retroactive effect to the constitutional rule announced in Miller.  Montgomery, 577 U.S. at 206.  Applying the retroactivity analysis from Teague v. Lane, 489 U.S. 288 (1989),[5] the Court rejected the argument

---

[5]Under Teague, courts must give retroactive effect to new substantive rules of constitutional law, including "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense."  Montgomery, 577 U.S. at

that <u>Miller</u> simply announced a procedural rule that required "a sentencer to consider a juvenile offender's youth before imposing life without parole." <u>Id.</u> at 208. Rather, <u>Miller</u> announced a substantive rule of constitutional law that "rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." <u>Id.</u> (cleaned up). In other words, the punishment of life without parole is disproportionate and unconstitutional "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." <u>Id.</u> at 209.

Through this line of cases, the Court has reaffirmed time and again that "children are constitutionally different from adults for sentencing purposes." <u>Miller</u>, 567 U.S. at 471. Juvenile offenders, with their "transient rashness, proclivity for risk, and inability to assess consequences," <u>id.</u> at 472, are in the eyes of the Constitution less morally culpable and more capable of reforming their deficiencies than adult offenders. <u>See id.</u> This "does not require the State to release [an] offender during his natural life," and "[t]hose who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." <u>Graham</u>, 560 U.S. at 75. But it does require affording a meaningful opportunity for release "to those who demonstrate the truth of <u>Miller</u>'s central intuition—that children who commit even heinous crimes are capable of change." <u>Montgomery</u>, 577 U.S. at 212; <u>see also</u> <u>Miller</u>, 567 U.S. at 479 ("'A State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (quoting <u>Graham</u>, 560 U.S. at 75)).

After <u>Montgomery</u>, Missouri enacted SB 590 in an effort to remedy Plaintiffs' unconstitutional sentences en masse. <u>See</u> Mo. Rev. Stat. § 558.047.1. The question

---

198 (quoting <u>Penry v. Lynaugh</u>, 492 U.S. 302, 330 (1989), *abrogated on other grounds by* <u>Atkins</u>, 536 U.S. at 321).

before us then is whether the parole review process provided under SB 590 lives up to the promise of Miller and Montgomery. Defendants argue that it does, relying on language taken from Montgomery in which the Supreme Court opined that "[a] State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." 577 U.S. at 212 (citing Wyo. Stat. Ann. § 6-10-301(c) (2013)). In their view, Missouri wholly remedied Plaintiffs' constitutional injuries by permitting Plaintiffs to be considered for parole once they have served 25 years of their sentence—effectively converting life without parole sentences into life with the possibility of parole.

Such a narrow reading of Montgomery, however, ignores its underlying, substantive reasoning—that a life without parole sentence is disproportionate and unconstitutional for "juvenile offenders whose crimes reflect the transient immaturity of youth." Id. at 208; see also Miller, 567 U.S. at 474 ("[I]mposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."). Indeed, as Montgomery recognized, making juveniles who received an unconstitutional sentence of life imprisonment eligible for parole remedies the violation only to the extent that doing so "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." Id. at 212. If Missouri chooses this route to remedy Plaintiffs' constitutional injuries, the parole review process must take into account the unique considerations of juvenile offenders, see Miller, 567 U.S. at 471–73, and provide Plaintiffs a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," id. at 479 (quoting Graham, 560 U.S. at 75).

B.

We next consider whether Missouri has in fact provided an adequate remedy for the constitutional violations at issue here. As noted, "a State is not required to

guarantee eventual freedom" to juvenile offenders. Graham, 560 U.S. at 75. Nevertheless, for Missouri's parole review process to comport with the Eighth Amendment,[6] it must consider the "distinctive attributes of youth" and whether "the penological justifications for life without parole collapse in light of [them]."[7] See Montgomery, 577 U.S. at 208.

Missouri's parole review process is lacking in several key respects. First, it limits Plaintiffs' access to information and their ability to effectively advocate their release on parole. Plaintiffs are prohibited from reviewing their parole files. This makes it nearly impossible for them to identify potential factual errors in their records or to adequately respond to adverse evidence that may have a direct bearing on the parole board's decision on whether they have "demonstrated maturity and rehabilitation." At the hearings themselves, Plaintiffs are limited to having one

---

[6]The district court reasoned that the meaningful opportunity standard applied equally to Plaintiffs' claims under the Eighth and Fourteenth Amendments. We are not so sure. See, e.g., Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 14 (1979) (analyzing under the standards set forth in Mathews v. Eldridge, 424 U.S. 319 (1976), and Morrissey v. Brewer, 408 U.S. 471 (1972), whether Nebraska's parole determination process comported with due process). Nevertheless, we conclude that Plaintiffs' Eighth Amendment claim fully resolves this action, and we do not consider Plaintiffs' due process claims.

[7]Defendants argue that the Supreme Court established in Virginia v. LeBlanc, 137 S. Ct. 1726 (2017) (per curiam), that a meaningful opportunity to obtain release requires nothing more than the consideration of the "normal parole factors." Id. at 1729; see also id. at 1730 (Ginsburg, J., concurring in the judgment). Contrary to that view, however, the Court expressly reserved its views on what the Eighth Amendment required. See id. at 1729. Instead, it held under the Antiterrorism and Effective Death Penalty Act of 1996 that it was not "objectively unreasonable" (i.e., not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," id. at 1728) for the Virginia Supreme Court to determine that employing normal parole factors provided a meaningful opportunity to receive parole. See id. at 1729.

"delegate" attend the hearing on their behalf. And that delegate is permitted to "address only issues related to transition to the community, which could include offender growth, support system, home and employment." A delegate may not, for example, provide information or evidence about any abuse or trauma suffered by the Plaintiff leading up to the underlying crime[8] or relatedly whether the Plaintiff's circumstances indicated their crime "reflect[ed] the transient immaturity of youth." Montgomery, 577 U.S. at 208. In contrast, victims may speak for any length of time, may speak outside of the inmate's presence, and are not limited in what they may speak about. Prosecutors and law enforcement representatives, too, are allowed to provide information without limitation on time or subject matter. Plaintiffs and their representatives—not victims or prosecutors—are the ones most likely to have information about the constitutionally relevant factors of maturity and rehabilitation. See Miller, 567 U.S. at 479. Yet Missouri's parole review process obstructs the Board's ability to hear and consider evidence reflecting those factors.

---

[8]The dissent questions whether this constraint exists by pointing to a parole hearing where the Plaintiff's delegate said the Plaintiff "grew up in deep poverty, deep neglect." Dist. Ct. Dkt. 134-15 at 49. But the delegate's remarks were exceedingly brief, and she did not elaborate on any circumstances from the Plaintiff's youth to explain this statement nor did she present any evidence in support. As to the delegate who described a Plaintiff's tumultuous upbringing, it is apparent that this delegate was the Plaintiff's sister. In addressing the Plaintiff's anticipated transition to the community, she described a job waiting for him in the family business and said she was "a representative of his entire support network." In her statement, she also provided some examples of the abuse the children in their family suffered but she too presented no evidence. Dist. Ct. Dkt. 134-16 at 33-37. One delegate's passing reference to poverty and neglect and another's brief description of the difficult upbringing she shared with her brother do not change the plain language of Missouri's Parole Hearing Procedures expressly limiting what a delegate may address at the hearing. Contrary to the dissent's suggestion otherwise, a delegate is not "free to discuss" any topic other than "transition to the community, which could include offender growth, support system, home and employment."

Missouri's parole review process also obfuscates whether the Board has truly given consideration to the "distinctive attributes of youth" and the considerations specific to this class of juvenile offenders. See Miller, 567 U.S. at 471–73. The Board uses a "barebones, boilerplate form" to inform Plaintiffs if they have been denied parole. The forms are unsigned and do not indicate how the Board voted or reached its decision. Significantly, the forms provide only two general reasons for denying parole: (1) that release "would depreciate the seriousness of the present offense," or (2) that there appears not to be a "reasonable probability at this time that the offender would live and remain at liberty without again violating the law." Even if the Board is not required to specifically identify the factors it relied upon to deny parole, cf. Jones, 141 S. Ct. at 1318–19, the form reflects the view that only these two factors are under consideration, which is contrary to Miller and Montgomery.[9] See id. at 1316 (noting that, under Miller, "an offenders's youth and attendant characteristics" must be considered as mitigating factors).

Missouri "freely admit[s] that these forms do not provide adequate explanation for the Board's decision." Nevertheless, Missouri refuses to provide Plaintiffs access to the recordings of their hearings and expects Plaintiffs to get additional information about a denial from their parole officers, at the same time acknowledging that parole officers have no knowledge of the Board's reasoning since they do not attend parole hearings. For a JLWOP Class member who is denied parole, this opaque process greatly impedes his ability to demonstrate maturity and rehabilitation at a future parole hearing. See Miller, 567 U.S. at 479.

---

[9]We note our particular concern that the lack of detail on these forms might enable transforming the Board's analysis from a thoughtful, contextual review of the Plaintiffs' unique characteristics as juvenile offenders into a perfunctory one, based solely on the perceived heinousness of the Plaintiffs' underlying crimes.

-15-

Finally, although SB 590 instructs the Board to consider factors like Plaintiffs' "[e]fforts made toward rehabilitation" and "subsequent growth and increased maturity," the Board's policies and practices are not structured to focus on those crucial considerations. See id. Before Plaintiffs' challenge to SB 590's parole review process, the Board did not use risk assessment tools or evidence-based, objective criteria to evaluate a Plaintiff's suitability for parole, using wholly subjective standards instead. Additionally, much of the focus of Plaintiffs' parole review hearings—in both the questioning and the witness statements—was on the underlying offense, and most of their parole denials turned on the "circumstances surrounding the [underlying] offense." But the circumstances of the underlying offense are constitutionally relevant only to the extent they pertain to the constitutionally relevant question—whether the crime reflects a Plaintiff's "irreparable corruption" or "transient immaturity." Montgomery, 577 U.S. at 208. Nothing in Missouri's parole review process convinces us that Missouri actually considers JLWOP Class members' crimes in this way, creating a real risk that the Board instead relies on the heinousness of Plaintiffs' crimes (all murders) to deny parole without consideration for their maturity and rehabilitation.

We agree with the district court that these policies and practices, when implemented and considered in combination, worked to deprive Plaintiffs of their Eighth Amendment right to a meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation. See Miller, 567 U.S. at 479. We are informed by the Supreme Court's clearly stated principle that juvenile offenders are "constitutionally different" than adult offenders, id. at 471, and "should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential," Graham, 560 U.S. at 79. Because the parole review process in place under SB 590 failed to adequately "ensure[] that juveniles whose crimes reflect[] only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence," Montgomery, 577 U.S. at 212, it violated the Eighth Amendment.

III.

Having determined that the district court properly held that Missouri's parole review process under SB 590 violated Plaintiffs' constitutional rights, we next consider the parties' appeal and cross-appeal from the district court's order regarding the appropriate injunctive relief to remedy that violation. We review the district court's remedial order for an abuse of discretion, see, e.g., Bone Shirt v. Hazeltine, 461 F.3d 1011, 1017 (8th Cir. 2006); see also eBay Inc. v. MercExchange LLC, 547 U.S. 388, 391 (2006) ("The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion."), reviewing any underlying findings of fact for clear error, see Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).

First, Defendants argue that the district court abused its discretion and usurped Missouri's role in fashioning a constitutionally sufficient remedy by requiring Missouri to use a risk assessment tool developed to address Plaintiffs' unique circumstances as juvenile homicide offenders. "[S]trong considerations of comity . . . require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." Lewis v. Casey, 518 U.S. 343, 362 (1996) (quoting Preiser v. Rodriguez, 411 U.S. 475, 492 (1973)). However, although "judicial restraint is often appropriate in prisoners' rights cases," "this policy 'cannot encompass any failure to take cognizance of valid constitutional claims.'" Bounds v. Smith, 430 U.S. 817, 832 (1977) (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)), *overruled on other grounds by* Lewis, 518 U.S. at 354; see Brown v. Plata, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."). In its Plan for Compliance submitted to the district court, Missouri proposed to use the Ohio Risk Assessment System (ORAS), a validated risk assessment tool, in each Plaintiff's parole review. Plaintiffs objected, arguing that the ORAS would not reliably measure Plaintiffs' risk of recidivism because it was designed using an Ohio population and was not tailored to a Missouri population; it

did not clearly control for racial disparities among the Missouri prison population and the JLWOP Class; and the ORAS, because it was designed for adults, treated certain characteristics inherent to juvenile offenders as aggravating factors. To the last point, according to one of Plaintiffs' witnesses, the ORAS may generate misleadingly disfavorable assessments of the JLWOP Class members, who by the nature of their crimes "have lived their entire adult lives in prison and, as a result, have less extensive education, employment, and personal relationship histories."

We find no abuse of discretion in the district court's order prohibiting use of the ORAS. The district court "scrupulously respected the limits on [its] role" by asking Missouri to devise a remedy for its constitutional violations in the first instance. Bounds, 430 U.S. at 832–33. Only after Missouri submitted its full proposal, which included the use of the ORAS to consider Plaintiffs' parole, did the court place limitations on it. Contra Lewis, 518 U.S. at 363 (concluding that the district court erred when, after finding a constitutional violation, it ordered a court-appointed special master rather than the defendant corrections officials to devise a remedial plan). And it did so only after an evidentiary hearing. Moreover, the district court was necessarily guided by Miller and Montgomery. Not only was the ORAS not developed for Missouri offenders or with the racial disparities within the Missouri criminal justice system in mind, it was also designed using the recidivism rates and characteristics of adult offenders. In practice, the ORAS intrinsically *disfavors* juvenile offenders *because of their youth*. This is directly contrary to the foundational principle underlying the Supreme Court's jurisprudence on juvenile offenders—that "children are constitutionally different from adults." Miller, 567 U.S. at 471.

Second, Plaintiffs argue that the district court abused its discretion by finding they were not entitled to state-funded counsel in their parole proceedings. Plaintiffs argued for the first time during the remedy stage of proceedings that state-funded counsel is necessary to ensure JLWOP Class members have a meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation. In their view,

state-funded counsel would crucially assist Plaintiffs to navigate the complexities of the parole process and would help clarify legal and factual issues for the Board. For example, attorneys are better suited to request important records on a Plaintiff's behalf, marshal evidence about a Plaintiff's childhood trauma and mental illness, and present that highly relevant information to the Board.

The district court summarily concluded that the Class members do not have a right to state-funded counsel under the U.S. or Missouri Constitutions. The district court's decision and reasoning, however, are "inadequate to permit this court to properly perform its appellate review function." Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5, 804 F.2d 469, 472 (8th Cir. 1986). We remand the case to the district court on this issue for further proceedings on whether the appointment of state-funded counsel is necessary to ensure members of the JLWOP Class "whose crimes reflect[] only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence." Montgomery, 577 U.S. at 212.[10]

IV.

Accordingly, we affirm the order of the district court that the parole review process of SB 590 violated Plaintiffs' Eighth Amendment rights, and we affirm the order that Missouri cannot use a risk assessment tool in its revised parole proceedings unless it has been developed to address the unique circumstances of the JLWOP Class. We vacate the order regarding appointment of counsel and remand for further proceedings consistent with this opinion. Plaintiffs' motion to strike is denied.

---

[10]The district court expressly declined to rely on Plaintiffs' expert witness on the issue of counsel, a matter the court is free to revisit on remand.

# APPENDIX A

(1) Efforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, when available;
(2) The subsequent growth and increased maturity of the person since the offense or offenses occurred;
(3) Evidence that the person has accepted accountability for the offense or offenses, except in cases where the person has maintained his or her innocence;
(4) The person's institutional record during incarceration; and
(5) Whether the person remains the same risk to society as he or she did at the time of the initial sentencing.

Mo. Rev. Stat. § 558.047.5.

(1) The nature and circumstances of the offense committed by the defendant;
(2) The degree of the defendant's culpability in light of his or her age and role in the offense;
(3) The defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense;
(4) The defendant's background, including his or her family, home, and community environment;
(5) The likelihood for rehabilitation of the defendant;
(6) The extent of the defendant's participation in the offense;
(7) The effect of familial pressure or peer pressure on the defendant's actions;
(8) The nature and extent of the defendant's prior criminal history, including whether the offense was committed by a person with a prior record of conviction for murder in the first degree, or one or more serious assaultive criminal convictions;
(9) The effect of characteristics attributable to the defendant's youth on the defendant's judgment; and
(10) A statement by the victim or the victim's family member . . . .

Id. § 565.033.2.

-20-

ARNOLD, Circuit Judge, concurring.

I write separately to respond to a point the dissent raises, namely, that the Supreme Court, in confronting the matter of juvenile punishment, did not intend to "judicialize the parole process."

I share this concern as a general matter, but the situation here is special. The Supreme Court in *Montgomery* expressly invited states to remedy a *Miller* violation by making inmates eligible for parole instead of going through the trouble of resentencing them. *See Montgomery*, 577 U.S. at 212. The Court explained that "[a]llowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* The Court was evidently proceeding under the assumption that making these offenders eligible for parole would mean that a parole board would consider juvenile offenders' youth and immaturity in deciding whether to parole them.

That's not always what happened in Missouri, despite state statutory dictates requiring it. Juvenile offenders were not always invited to demonstrate that their crimes were the result of transient immaturity even though that's what the *Montgomery* Court assumed they would be allowed to do. The dissent points out that inmates and their delegates, in addressing their "transition to the community," could address "'offender growth,' a topic that readily allows for information about the offender's maturity and rehabilitation." But the district court held it was undisputed that, in practice, inmates and delegates were able to discuss only "inmates' home plans" and were "foreclosed from advocating for consideration of the *Miller* factors and other factors that the Board is required to consider." I can't think the *Montgomery* Court envisioned that a parole proceeding that prohibits inmates from discussing *Miller* could cure a *Miller* violation.

-21-

The dissent responds by identifying instances in the record where the parole board had information about inmate maturity and rehabilitation before it, whether in the form of an inmate's testimony at a parole hearing or a prehearing report that a probation officer prepared after interviewing the inmate. The dissent also opines that the district court offered "paltry support" for its holding that it was undisputed that delegates generally could not discuss an inmate's maturity and rehabilitation.

But the state does not seriously challenge the district court's holding. When the party against whom a holding is made does not challenge it on appeal, we typically do not address the matter. At one point in its brief the state says opaquely and without citation to the record that inmates "have the opportunity to show the Board that they have changed and to be considered for release." But the state made this remark in the context of arguing that the court's determinations "misse[d] the point" as a legal matter, not that they were an erroneous evaluation of the record. So I would follow our ordinary course and not seek to undermine the district court's holding, especially as there may be good reason that the state did not press the issue.

In any case, the dissent has at most shown that there is evidence that an inmate's maturity and rehabilitation have been discussed during some proceedings. But it still does not appear that an inmate is guaranteed a way to demonstrate his maturity and rehabilitation. The discussions of these matters in the prehearing reports that the dissent cites are modest and perfunctory; they are not what one would expect from an inmate allowed to make his case. I see no guarantee, moreover, that the parole-hearing panel would broach the subject on its own or that the inmate will otherwise be allowed to discuss the matter.

In short, there is no showing that the quantity and quality of the information on maturity and rehabilitation that a Missouri inmate can present is not at the whim of the officials who conduct interviews and hearings. *Miller* and *Montgomery* require more.

I therefore join Judge Kelly's opinion in full.

COLLOTON, Circuit Judge, dissenting.

In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the Supreme Court addressed how a State may remedy a violation of the rule of *Miller v. Alabama*, 567 U.S. 460 (2012), that a court may not sentence a juvenile homicide offender to a mandatory term of life without parole. *Montgomery* declared that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." 577 U.S. at 212. Missouri did what *Montgomery* prescribed: it provided by statute that a juvenile homicide offender who was originally sentenced to mandatory life without parole may petition for parole after serving twenty-five years of his sentence. Mo. Rev. Stat. § 558.047.1(1). That should be the end of this case.

The court goes much further and purports to apply the Eighth Amendment rule of *Miller* and *Montgomery* regarding imposition of sentence in a criminal case to Missouri's parole process. The result is a federal injunction that dictates detailed changes to the Missouri parole procedures and a remand to consider whether the Constitution requires the appointment of state-funded lawyers to represent juvenile homicide offenders in parole proceedings. It seems to me that there are several analytical difficulties with the court's approach.[11]

---

[11]The procedures dictated by the district court include, among others, that (a) inmates may bring four delegates to each parole hearing, (b) the parole board may not deny parole based solely on the seriousness of the homicide offense, (c) all inmates who were denied parole must be granted new hearings within ninety days of the conclusion of this case, (d) all members of the parole board and participating staff must receive "training on the requirements of *Miller*, *Montgomery*, and *Graham*," (e) the State must provide an updated parole file (including a privilege log) to each inmate at least six months before any parole hearing, (f) the State must use a "pre-hearing interview form" that includes a quotation from *Miller* and "spaces for the Institutional Parole Officer to note whether any rehabilitative or training programs were unavailable to the inmate and why," (g) after reaching a decision, the members of the parole board must "document the reasons for their votes, as well as any evidence indicating unsuitability for parole," (h) the parole board "shall not use any

First, by holding that the State did not remedy the *Miller* violations when it permitted juvenile homicide offenders to be considered for parole, the court accepts the contention of the inmates that their sentences are invalid. Appellees' Br. 23-24, 30. That is not a proper conclusion in an action like this one under 42 U.S.C. § 1983. A prisoner challenging his underlying sentence on federal constitutional grounds in federal court is limited to pursuing a writ of habeas corpus under 28 U.S.C. § 2254. *Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973). The inmates understandably seek to circumvent that requirement: the Missouri courts have rejected their argument based on *Miller*, and a federal court may not grant relief under § 2254 unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d); *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728-29 (2017) (per curiam).

The federal habeas courts in Missouri uniformly have rejected claims of juvenile homicide offenders that the state courts unreasonably applied *Miller* and *Montgomery* in denying relief from their sentences. *Burris v. Cassady*, No. 4:16-CV-01565, 2021 WL 1380271, at *3-4 (E.D. Mo. Apr. 12, 2021); *Davis v. Bowersox*, No. 4:16-CV-00246, 2020 WL 1878743, at *6-7 (W.D. Mo. Apr. 15, 2020); *Wilson v. Wallace*, No. 4:16-CV-00419, 2020 WL 1324043, at *5 (E.D. Mo. Mar. 19, 2020); *Hack v. Cassady*, No. 16-CV-04089, 2019 WL 320586, at *4-6 (W.D. Mo. Jan. 24, 2019); *Saddler v. Pash*, No. 16-CV-00363, 2018 WL 999979, at *3 (E.D. Mo. Feb. 21, 2018); *Ramirez v. Griffith*, No. 16-CV-1058, R. Doc. 8, at 4-6 (W.D. Mo. Dec. 2, 2016). The inmates seek to make an end-run around those decisions and the

---

risk assessment tool unless it has been developed to address inmates affected by *Montgomery* or *Miller*," (i) if a victim or victim's representative chooses to speak to the parole board outside the presence of the homicide offender, the State must either provide state-funded counsel to the inmate, provide the inmate and his delegates a live video or audio feed of the victim's testimony, or provide the inmate with a transcript of the victim's statements and an opportunity to respond, (j) inmates have a right to counsel at their own expense at a pre-hearing interview with parole board staff, and (k) an inmate may bring to any parole hearing an expert witness whose presentation "shall not be limited in any fashion." R. Doc. 179, at 13-23.

constraints of the Antiterrorism and Effective Death Penalty Act of 1996. But a petition for writ of habeas corpus is the only appropriate remedy to challenge the validity of their sentences.

This case is unlike *Wilkinson v. Dotson*, 544 U.S. 74 (2005), where the prisoner plaintiffs did not dispute their underlying sentences when they relied on § 1983 to challenge procedures and guidelines employed by a parole board. The inmates here contend that the parole board must change its procedures in order to remedy a constitutional violation that otherwise renders their sentences invalid. Their lead argument on appeal is that "the sentence actually imposed upon the members of the Juvenile Class—mandatory life without [parole]—is not valid," and that "[t]o rectify that unconstitutional sentence," the State must change its parole procedures. Appellees' Br. 23-24.

Second, even if the inmates could properly challenge their sentences in this § 1983 action, there is no merit to the argument that the State has failed to remedy the *Miller* violations by permitting these homicide offenders to be considered for parole after twenty-five years. *Montgomery* said explicitly that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." 577 U.S. at 212. *Montgomery* cited with approval a Wyoming statute that makes such offenders eligible for parole consideration after serving twenty-five years. *Id*. (citing Wyo. Stat. Ann. § 6-10-301(c) (2013)). Missouri did just that—and perhaps made the offenders eligible even fifteen years earlier than was required. *See Graham v. Florida*, 560 U.S. 48, 124 (2010) (Alito, J., dissenting) (citing petitioner's concession that a sentence of forty years without possibility of parole would "probably" be constitutional for a juvenile *non*homicide offender).

It is not a "narrow reading" of *Montgomery* to conclude that the State has conformed to *Miller*; it is a fair reading of *Montgomery*'s express invitation. *See Hicklin v. Schmitt*, 613 S.W.3d 780, 787-89 (Mo. 2020). The Supreme Court recently emphasized that rather than make inferences from the Court's various decisions about

-25-

sentencing of juvenile offenders, we should follow "what *Miller* and *Montgomery* said—that is, their explicit language addressing the precise question before us." *Jones v. Mississippi*, 141 S. Ct. 1307, 1322 (2021). That explicit language calls for rejecting the Eighth Amendment claim here.

Third, if the inmates bring a proper action under § 1983 that does *not* challenge the validity of their sentences, then *Miller* and *Montgomery* have no application. *Miller* held only that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. If the inmates do not challenge the validity of their sentences, then it is a given that the State has remedied the *Miller* violation by permitting the juvenile homicide offenders to be considered for parole. *Miller* and *Montgomery* did not purport to go further and direct federal courts to scrutinize in a civil rights action whether a State's parole procedures afford "some meaningful opportunity" for release of a juvenile homicide offender. The so-called "*Miller* factors" apply only to a judge's decision at sentencing whether to impose a term of life imprisonment without parole. *Montgomery*, 577 U.S. at 210. As the Fourth Circuit observed, accepting the inmates' argument here would require this court to conclude (1) that the Supreme Court's juvenile-specific Eighth Amendment protections extend to juvenile homicide offenders sentenced to life *with* the possibility of parole, and (2) that those protections extend beyond sentencing proceedings. *Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019). The majority's decision is a substantial extension of *Miller* and *Montgomery*; like the Fourth Circuit, I would "decline to go so far." *Id.*[12]

---

[12]The district court ruled that its analysis of *Miller* and *Montgomery* applied "equally" under the Due Process Clause. In my view, the inmates' claim under the Due Process Clause fails because they have no liberty interest in release before expiration of their valid sentences, *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Gale v. Moore*, 763 F.2d 341, 343 (8th Cir. 1985) (per curiam), and no liberty interest in parole procedures themselves. *Olim v. Wakinekona*, 461 U.S. 238, 250 & n.12 (1983).

Fourth, even indulging the assumption that the Eighth Amendment applies to parole proceedings for juvenile homicide offenders who are sentenced to life *with* the possibility of parole, there is no violation here. The juvenile homicide offenders are eligible for parole after twenty-five years (at age forty-two for an offender who was sentenced for murder at age seventeen), and Missouri law requires the parole board to consider, among other factors, the following: (1) the degree of the defendant's culpability in light of his age and role in the offense, (2) the defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense, (3) the defendant's background, including his family, home, and community environment, (4) the likelihood for rehabilitation, (5) the effect of familial pressure or peer pressure on the defendant's actions, (6) the effect of characteristics attributable to the defendant's youth on the defendant's judgment, (7) efforts made toward rehabilitation since the offense occurred, (8) subsequent growth and increased maturity of the person since the offense occurred, (9) evidence that the person has accepted accountability for the offense, (10) the person's institutional record during incarceration, and (11) whether the person remains the same risk to society as he did at the time of initial sentencing. Mo. Rev. Stat. §§ 565.033.2, 558.047.5.

Consideration of these factors provides "some meaningful opportunity" for an offender to obtain release based on demonstrated maturity and rehabilitation. The majority says that a form used by the parole board to record its decisions does not mention these factors, and "reflects the view" that they are not considered. But the district court determined that the inmates failed to make a *prima facie* showing that the parole board fails to consider the statutory factors, R. Doc. 158, at 24-26, and the inmates do not appeal the dismissal of that claim. In any event, one of the "general reasons" cited on the form—no apparent "reasonable probability at this time that the offender would live and remain at liberty without again violating the law"—naturally encompasses whether the inmate has matured and rehabilitated to the extent that he is an appropriate candidate for parole. There is nothing impermissible about also considering the seriousness of the inmate's particular homicide offense in the parole determination. An offender who committed a murder that was especially heinous,

-27-

atrocious, or cruel could reasonably warrant different consideration, and a different timeline for release, than one whose offense was less aggravated.

Missouri provides offenders with advance notice of their parole review, an opportunity to be heard (including through a delegate who may be a lawyer), and an opportunity to submit documents and letters of support. Inmates are interviewed by parole staff before the hearing, and the parole board considers a report from staff that addresses readiness for parole. These reports address maturity and rehabilitation. *See* R. Doc. 138-16, at 12 (SA 605); R. Doc. 138-19, at 10 (SA 696); R. Doc. 138-20, at 11 (SA 708); R. Doc. 138-21, at 8 (SA 717). At a hearing, the inmate and his delegate are permitted to address issues related to transition to the community, including "offender growth," a topic that readily allows for information about the offender's maturity and rehabilitation. R. Doc. 65-3, at 4. That the parole board may hear more from victims and law enforcement, and may consider the seriousness of the offender's homicide offense, does not mean that there is no "meaningful opportunity" for parole. These other matters are appropriate for consideration in a parole proceeding, and the State is not required to adopt procedures that are more advantageous to juvenile homicide offenders seeking release from custody.

The concurring opinion adverts to a sentence in the district court's order that says "in practice, . . . delegates are directed to discuss only inmates' home plans." R. Doc. 158, at 21. The district court, however, cited only one parole hearing, during which a panel member told the inmate's delegate (his sister) that "really what I need to know from you is what kind of support you have for him upon release," and that "[w]e're not going to retry the case." R. Doc. 139-32, at 20, 45 (Tr. 17, 42). The sister was presented as the inmate's "home plan" if he were released, so the parole board understandably wanted to know about the support that she would provide. The board quite reasonably declined to retry the underlying murder case. This case-specific direction to a delegate in one particular hearing is paltry support for a conclusion that Missouri undisputedly forbids delegates as a general matter to discuss maturity and rehabilitation. And it says nothing about what inmates themselves may discuss when speaking to "offender growth."

In the very parole hearing cited, the inmate discussed maturity and rehabilitation at length. R. Doc. 139-32, at 37-43 (Tr. 34-40). He spoke of his work in prison, his relationship with his family, his pride in maintaining good health, his decision to "follow the rules" and "stay out of trouble," and his choice "to hang around with people of like-minded interest." A panel member asked what made him change, and the inmate described "a gradual process of maturity" that had a lot to do with his family. When another panel member asked how he evolved from a youthful "knucklehead" to a 46-year-old inmate with virtually no disciplinary record, the inmate said: "I'm still living my life. I feel like my life's still worth something even if I have to do the rest of my life in here." The inmate explained that he earned a GED at the Potosi Correctional Center, and that he completed other educational programs—Impact of Crime on Victim Classes, a drug abuse program, and courses on computer and employment skills at Missouri Vocational Enterprises. A panel member asked about job skills that could facilitate obtaining employment upon release, and the inmate said that he had worked in the furniture factory at Jefferson City, in food service as a cook, and currently as a porter at the correctional center. This was not a parole proceeding that prohibited the inmate from discussing maturity and rehabilitation.

In another parole hearing for one of the plaintiffs, a panel member invited the inmate to discuss why he was no longer "the same person" who committed the homicide offense. The inmate explained that "I'm no longer that same person because I've grown into a responsible, mature adult who has the thinking ability to not only know right from wrong but do right from wrong." He continued that "every human being" has a right to live "without the fear of someone taking their belongings or hurting them." He described his understanding of "what it means to love, to not hurt people," and said that he would "no longer ever, ever be that immature, vulnerable little boy" who committed the homicide. R. Doc. 134-15, at 35. The inmate explained that he grew up in "a crime-infested neighborhood" that was "just the worst of the worst," with a mother who was "never there" and a stepfather who was an alcoholic. *Id*. at 38, 46. But he told the parole board: "I came to this prison at the right time because it gave me room to grow as a man." He explained that there

-29-

were many programs available to him at prison, and that he "took full advantage of those programs." He remarked that he "started just changing [his] life," "started believing in God more," and "started just wanting to be a better person." *Id*. at 41. He said: "I love the man I have become. I don't like the little boy I was. I don't like what I've done. I am ashamed. . . . [A]ll I can offer is I'm not the same person." *Id*. at 44. Again, there was no prohibition on discussing maturity and rehabilitation.

In that proceeding, the inmate's delegate—after stating that the inmate "has really presented things as well as they could be presented"—also discussed maturity and rehabilitation. She cited the inmate's remorse. Contrary to the majority's assertion that a delegate may not "provide information or evidence about any abuse or trauma suffered by the Plaintiff leading up to the underlying crime," *ante*, at 14, this delegate told the parole board that the inmate's upbringing in "deep poverty" and "deep neglect" allowed an adult offender to take the inmate "under his wing" and deploy a "very sick ruse" to involve the inmate in a robbery and homicide. The delegate said that she had worked with the inmate for five years, and that the inmate "today is not that kid" who committed the homicide. The delegate assured the board that she and her colleagues would provide "holistic support"—including assistance with a "business plan" and "collateral consequences"—if the inmate were released. She explained that the inmate "did not have that kind of support growing up," and remarked that his family would be there for him as well. R. Doc. 134-15, at 48-50. The delegate was not foreclosed from discussing the inmate's disadvantaged background and his growth as an adult.

A delegate in yet another hearing described the inmate's "tumultuous upbringing" in a "broken, abusive home" that involved "abuse of every form." This abuse included "everything from being verbally abused, challenged, bullied, cursed out, belittled on a regular, constant basis to the beatings with anything [his] mother or [his] father picked up," such as "switches from trees, water hoses, plastic bats, [and] electrical extension cords." The delegate explained that the inmate was "exposed to inappropriate sexuality" through his mother's extramarital relationship, saw his "father beating [his] mother on a regular basis," and saw his father "chase

-30-

[his] mother through the house with a shotgun." The delegate told the parole board that the inmate had "matured immensely from the angry young man he was when he came" to prison. She said that the inmate had "learned to talk out his problems and resolve his problems with intellect," that "he does seek advice from other people," and that "he's no longer stubborn and selfish." The delegate explained that the inmate had worked as a clerk in the prison law library, and had "taken on personal development" through reading the Bible, newspapers, and magazines. R. Doc. 134-16, at 33-37. Again, consistent with procedures allowing a delegate to address "offender growth," the delegate was free to discuss abuse suffered by the inmate leading up to his homicide offense, along with the inmate's increased maturity and efforts at rehabilitation as an adult.

In sum, the record shows that there is no undisputed "practice" in Missouri that directs an inmate's delegate at a parole hearing to discuss only an inmate's home plan. The district court did not even assert that there is such a practice with respect to inmates. And the record is clear that no rule or practice forbids an inmate to address his maturity and rehabilitation. The State contends, with ample support in the summary-judgment record, that Missouri inmates at parole hearings were "allowed to provide information that could help convince the Board they were ready for parole," and that inmates "have the opportunity to show the Board that they have changed and to be considered for release." But the concurring opinion would affirm the district court's broad injunction based on a faulty factual premise that "inmates and delegates were able to discuss only 'inmates' home plans.'" The concurrence ultimately concludes that the inmates have established a class-wide violation of the Eighth Amendment because the parole board has discretion ("whim") to regulate the "quantity and quality of the information on maturity and rehabilitation that an inmate can present." Either way, the decision is an unjustified intrusion upon the State's sovereign administration of its criminal justice system. *See Jones*, 141 S. Ct. at 1321.

Nor is there a constitutional flaw in the parole board's manner of recording its decisions. The Eighth Amendment does not require a state sentencing judge to make so much as a factual finding of permanent incorrigibility before sentencing a juvenile

homicide offender to life *without* parole. *Id*. at 1318-19. It is assumed that the judge will consider the defendant's youth, and any federal requirement to make specific findings would be "intruding more than necessary" upon the States. *Id*. at 1321. Yet the court now holds that the Eighth Amendment justifies an injunction requiring members of a state parole board to "document the reasons for their votes" to deny a periodic request for parole, and to specify "any evidence indicating unsuitability for parole." R. Doc. 183, at 19. The two conclusions cannot be reconciled. *Cf. Greenholtz*, 442 U.S. at 15 (rejecting contention that due process requires a parole board "to specify the particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release," because such a requirement "would tend to convert the process into an adversarial proceeding").

A requirement to allow "some meaningful opportunity" for release, even if applicable to these juvenile homicide offenders, is modestly phrased. The juvenile homicide offenders in Missouri received more process than offenders under the regular parole process: they presented more documentary evidence than adult offenders, received longer hearings than the average parole hearing, and were entitled to consideration of statutory factors that apply only to juveniles who were formerly sentenced to life without parole. Of the twenty-eight juvenile homicide offenders considered for parole under Mo. Rev. Stat. § 558.047, four were scheduled for release after their first parole hearing. The others were scheduled for reconsideration within five years. Yet the court concludes that these offenders were not afforded "some meaningful opportunity" to obtain release based on demonstrated maturity and rehabilitation. In my view, a fair reading of the Supreme Court's juvenile-specific jurisprudence under the Eighth Amendment does not justify declaring a constitutional violation and imposing on the State the elaborate set of parole procedures endorsed by the district court.

For these reasons, I would reverse the judgment of the district court and vacate the injunction. As such, it is unnecessary to address the appeal and cross-appeal regarding the terms of the injunction, but I nonetheless register my disagreement with

the majority's remand for consideration of whether the Eighth Amendment requires state-funded counsel for juvenile homicide offenders seeking parole. That contention was a bridge too far even for the district court. The legal issue has been fully briefed on appeal, and no more elaborate decision from the district court is necessary to comply with the rules of civil procedure or to enable appellate review. At the liability stage, the district court found no constitutional violation based on the absence of state-funded counsel. Requiring the State to provide lawyers to litigate at the parole board would impermissibly extend the relief "further than necessary to correct" the purported violation. 18 U.S.C. § 3626(a)(1); *see Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014) (concluding that § 3626 applies to a challenge to parole procedures). In any event, inmates seeking parole are not entitled to state-funded counsel even when they have a liberty interest in release, *see Greenholtz*, 442 U.S. at 16, and the district court did not err in declining to impose this additional mandate on the State based on a novel interpretation of the Eighth Amendment. I see no indication that the Supreme Court intended through its decisions in *Graham*, *Miller*, and *Montgomery* to judicialize the parole process in the manner urged by the inmates.

_____